A paper shuffle. This second case is Ferring v. Watson & Apotex, 2014-14-16. And we're going to hear from Mr. Boggs, when he is ready, on behalf of Watson. And what do you have to say about confidentiality? Will you waive it as well? Yes. Thank you. Thank you. There you go. We're ready when you are. Okay, great. Thank you, Your Honors. So we were the other half of that case. And our case was a design around case. And in essence, our client set out and designed around Ferring's patents. And that's encouraged behavior, of course, in our system. But it only works if the system stays true with what the patent claims say. And in the case of the Hatch-Waxman Act, looks at the actual product that will be marketed. And that did not happen here. The lower court committed a number of legal errors during our trial. And those errors, in turn, led to clearly erroneous fact-finding. We are in a position here to reverse the ultimate judgment of infringement under 271E and 271A. Now, the errors, there were many. The highlights, the court found the ANDA manufacturing specifications to be irrelevant as a matter of law in his analysis. That's clearly wrong. The court, secondly, the court read out of the claims the requirement that the modified release materials actually had to modify the release of the active ingredient. Also wrong. And the court erred when it read out of the claims the requirement that the dissolution rate actually be measured by the USP 27. But, as we just heard, the USP is specified in the claims and required by the claims. So first, through the urging of Farring, the district court found that the Synovian case stands for the proposition that in a 271E case, ANDA manufacturing specifications are irrelevant as a matter of law. We can see that in the appendix at 2209 to 2210. Of course, that's simply not correct. This is directly contrary to Glaxo. And as a result, the district court did not consider all of the amendments to Watson's ANDA and all of the changes in Watson's ANDA product. What are the clearest, simplest reasons why you don't infringe Farring patents? The simplest and most direct reason is what was found to infringe were the 17K... Take the 739 patent. The 739 patent of... The court found that the cores of the product would infringe if they were made at 17KP pressure. The logic being that that particular core would produce... Well, the hardness 17KP is not in the claims. That's true, but the argument was that a 17KP core would produce the dissolution profile that you see in the claims, the water dissolution test. Are what we're looking at here the core, the dissolution rate of the core, or the dissolution rate of the coded tablet, which is what's actually administered to a patient? Well, as it unfolded, the court looked at both. Well, I'm saying what the court did. I'm saying is the proper approach here to look at the core or the coded tablet, because it seems to make a difference in terms of infringement. Yeah, our position has always been that this product, the patent, was directed to a finished pharmaceutical product. Which would be the coded tablet. The coded tablet, yes. I mean, isn't that a simple argument as to why there's no infringement, because the coded tablet doesn't have the dissolution rate that's specified? Yes, that is one of them. That is the reason for the coded tablet, but the court was considering the core's standing alone as well. The court was, but the question is, was the court, should the court have been looking to the core, or should the court have been limited to the coded tablet? The court should have been limited to the coded tablet, yes. And what does the ANDA show about the coded tablet? The ANDA shows about the coded tablet would not infringe. Is there a dispute about that? There is, yes. Well, what does the claim say? It says 739, 100% in 20 minutes. These are claim limitations, Mr. Boggs. I'd assume that you have them on hand. Yeah, the claim limitation in question is less than 70% by weight at about 45 minutes. And their evidence shows at 17 kp, 71 at 45 minutes. Well, I thought your product was 16% at 45 minutes, which is less than 70%. Isn't your strongest argument that 100% at 120 and 37%, which is not about 100%? Well, the coded product is actually the reverse. The coded product is much slower than these specifications require. The core, which is what the court was looking at, is a faster and immediate release formulation that happened to hit the 70%. You said the core. Yes. But you say that's the wrong material. Exactly, yes. Well, proceed. Your time is running. All right. So in the end, when the court did not consider our manufacturing specifications, it did not ultimately consider the product that was ultimately going to be marketed. What did the court overlook that would have shown? Well, in our ANDA specifications, our manufacturing specifications, we have a requirement that the target for pressure is 15 kp. And there's a manufacturing spec that says when it gets to 16 kp, turn it back to 50. Why are you arguing kp when that's not in the claims? And you want to be free from the claims. Well, the— Why aren't you targeting the claims? Well, the relationship that was established was between the pressure and the dissolution profile. That's the link. Well, I'm not sure that that's true. There doesn't seem to be any consistent relationship between hardness and the dissolution profile. Look at the numbers. They seem to go up and down without rhyme or reason. I agree with that, Your Honor. And we did argue that, as a factual matter, the data is not linear. There's no answer, really, to that question. Do you want to talk about validity? That's another aspect of your argument. Yes, I do. Validity—you know, as I said, we believe that the court read out a lot of limitations of this claim. But at the end of the day, what happened here is that we have a 650-milligram tablet of tranexamic acid. Tranexamic acid was not new. There existed in the prior art 500-milligram tablets of tranexamic acid. Didn't the FDA put this on a fast track? Isn't that a secondary consideration that's very powerful? No, it's not, Your Honor. That just means that there wasn't a product that was currently approved by the FDA. Doesn't that go to unmet needs? No, it doesn't. You know, this is a worldwide view here. There was plenty of tranexamic acid tablets in the world. They were approved worldwide. They were even approved in the United States. They simply hadn't been marketed by Pfizer, it was. So that's not an unmet need. There simply was no need. What was needed was somebody to market it. You know, there's no nexus there with the invention. You mean the market system wasn't working? There was a need that wasn't being met and Ferry met it and gets no credit for that in terms of obviousness evaluation? Not in a patent law sense, Your Honor. That has nothing to do with whatever invention they had. Tranexamic acid tablets had already been approved in the United States. You mean at 650? No, at 500 milligrams. But the key here is that the daily dosage in the prior art that was known was 3,000 to 4,000 milligrams per day. The cyclocapron tablets that were available were 500 milligram tablets, as I said, and it was recommended for a patient to take two of those four times a day to hit the target of 4,000. The patent claims say 650 milligrams. You take two of those three times a day and you get 3,900 milligrams, right smack in the middle of the prior art, what the prior art teaches. Now that's math. That's math. That's not inventive. The tablets themselves in the body are not any different than those 500 milligram tablets from the bioequivalent standpoint. The only difference they can point to is this out-of-the-body water test, which from a therapeutic standpoint doesn't mean a thing. You're well into your rebuttal time. Do you want to continue the— I'll save the rest of my time. All right. Mr. Brown. Good morning, Your Honor. And I assume the confidentiality isn't yours. Yes, Judge Lurie. The confidentiality, I believe, is all Watson's to the extent there is any fair and confidential. I believe it right now. May it please the Court. Let me begin with the coded test. You don't mention 271A infringement in your brief. Does that mean you've given up on it? Not at all, Judge Dyke. Excuse me. That's where I was going to begin. Counsel said there was—I think he conceded there was a dispute over infringement of the coded tablets. In fact, our position is there was no dispute, that there were samples that were tested— Wait, wait, wait. I'm not in the E yet. I'm talking about 271A. And you don't discuss that in your brief. I mean, is that a waiver of the argument that there's 271A infringement? It's not a waiver, Judge Dyke. We discussed the basis for affirming the district court's findings over 271A and E. And when we talk about specific samples of commercial tablets that were tested and infringed— But you disregard addressing the 271A finding. I don't agree, Judge Branion. We do address why the basis for the judge finding 271A infringement. Again, there were commercial samples that were available in the litigation that were tested. Now, I concede that our focus in litigation was— Well, let's talk about 271A. Why does the ANDA show that the coded tablets infringe under 271A? Why does the ANDA show— Well, there's two— All right, so there are two issues that were disputed for infringement. There was the modified release material and the dissolution. As far as modified release material, it's all over the ANDA that the components modify the release of the tranexamic acid. No, we'll come back to that. Let's stick with the other issue. Okay, you want to focus on dissolution. The dissolution, the testing of the ANDA is in simulated gastric fluid. We have testimony that's equivalent. But, in fact, we had samples of their product that were tested. They were tested in four different labs. Every single lab showed that certain of the samples met the dissolution limitations. And, in fact, two of those labs were Watson's own labs, their internal lab and a lab they hired. Their expert witness, Watson's expert witness, looked at those test results and he said, yes, they meet the requirements of the patent claims. So there was no dispute. It's mathematics. You can't dispute it. Those samples tested, commercial samples tested. Seven out of 350. It depends on how you do the math, Judge Dyke. If you look at specific batches, it was, by their own testing, their own samples, 16% of two batches. That's what's permitted under the ANDA, up to at least 16% infringement. If you add in the samples we tested, by our evidence, it was 35% of one of the commercial lots. That's about a third of their lot is infringing. The judge found that constituted evidence of infringement under 271E and A. And that's what we explained in detail in our brief. But quite apart from the samples, doesn't the, let's look at the ANDA itself. Isn't there a dissolution profile in the ANDA? There is a dissolution profile in the ANDA, yes. I believe it's greater than 80% at 90 minutes. But it's measured in simulated gastric fluids, so it doesn't directly address the claims, which are water-based tests. We would argue that it's equivalent, and we had testimony that based on the ANDA specifications, they infringe under the doctrine of equivalence. But because it's a water-based test, and the ANDA specification is a different fluid, simulated gastric fluid, we tested actual product samples. Those samples showed infringement up to at least 16% of the time for certain batches, by their evidence. If you include our evidence, up to 35% of the time for specific commercial batches. Now, Mr. Brown, let me ask about the 90-minute data. The Watson product seemed to be 29% 90 minutes. And the claims of two of Farron's patents were not less than about 50. 29% sure is a whole lot less than about 50. We didn't argue that 29% was greater than 50, if that's your question, Judge Laurie. That means non-infringement. For that specific sample, there were multiple samples tested, and the evidence was that up to 16% of certain batches, undisputed evidence, infringed. And yet, if only 16% infringed, that does presume that others don't meet the claims, but they're not allowed to infringe at all. And they're infringing with certain commercial batches by their own evidence, by their own experts' admission, up to 16% of the time. That's not allowed. That's not permitted. In 120 minutes, 37%, which doesn't meet the limitation of about 100. I can agree with that, Judge Laurie. Again, that's that evidence. They can go and manufacture something non-infringing. It doesn't allow them to go and manufacture something infringing as well. And the fact is that they had commercial batches of product that contained up to 16% infringing. What is the ANDA request? The ANDA request, the ANDA has a specific competition of their product and has a specific dissolution limitation. And how about 120 minutes? What's it requesting? I don't think there is. My memory, Judge Laurie, is that they have a specification and it's greater than 80% in 90 minutes. That's it. And it's tested and simulated gastric fluid. That wasn't an issue that was litigated because we had actual products to test. We did that instead. In your view, this is a Glaxo case rather than a Synovian case? I would view it as both a Glaxo and a Synovian case, Judge Dyke. What I would say is we had evidence-specific samples, 271A and E, and the fact that their ANDA specification allowed production of up to 16% of batches with those infringing samples shows that then under Synovian, the scope of their approval encompasses infringing formulations. We just had direct evidence. What's the effect of the amendment that they secured in this case? I don't think there's any effect. First of all, that amendment goes to the hardness level, which is something that we set aside for a minute, of the cores. There's no evidence that makes any difference whatsoever with respect to the infringement of the coded tablets. There's no known relationship between tablet hardness and the dissolution of the coded tablets. I believe someone said there is no relationship. There is, in fact, a relationship between hardness of the uncoded tablets and dissolution, and I can give you a site. Uncoded tablets. Uncoded. Did I misspeak? It's 14840, and it's a graph, and it shows that you get harder, you go slower. It's a clear one-way direction, so there is a relationship. Now, with respect to the uncoded tablets, Judge Dyke, they didn't argue on appeal that the judge made any error of law in finding infringement with respect to the uncoded tablets, and therefore that argument is not available to them now, even if you think there's some issue with that. They're arguing that the coded tablets are the relevant thing. What about the weight limitations in the patent claims? It strikes me that your own witness said that having particular material in the tablet doesn't necessarily have a material effect, and so how do you deal with that? Most of your testimony is, well, having this material can have an effect. I don't think that's true, Judge Dyke. Again, we're faced with a situation where we have no choice. I've looked at this testimony. Show me where the testimony says that in their tablets this material does have an effect. It's abundant in the brief. It's abundant in the brief, and I've read the references. Show me one that says can. The testimony says can. It repeatedly says can have an effect, can have an effect. It doesn't, in my view, say it does have an effect. You agree that the claim construction requires that it does have an effect, right? The claim language is that it's a modified released material. The judge interprets that as a material that modifies the release. It does have an effect, right? Well, I think modified implies it does have an effect. So where's the testimony that it does have an effect? Well, I would look at, first of all, there are three main pieces of evidence, and the testimony of Dr. Williams is at 951 of the record and also 1999 of the record, and he relied on, again, three pieces of evidence. The AMDA itself talks about how the components of their uncoated tablet modify the release so that it's neither too fast nor too slow. That is an admission by them. Just show me one piece of testimony where they say that there is an ingredient that satisfies the weight percentage that does have an effect instead of can have an effect. Well, again, the pages I cited, I could read them out loud to you, but you're talking about the evidence. Read one of them out loud to me. Show me where they say it. I've read this testimony, and it seems to me it's dealing with can rather than does. While I'm finding it, let me point out that there are admissions by their own. You're supposed to be familiar with this. Did you hear Dr. Moran? Where are you reading from? I'm sorry, this is A1999. Yes. Did you hear Dr. Moran testify that only the excipients in the color-coding of Watson's generic training-specific tablets constitute the modified release for all these products? That's what I understood. Yes, I heard it. Did you agree with Dr. Moran? I do not. Would you explain the basis for your disagreement with Dr. Moran, referencing PTX381, about which he testified in Farrington's case in chief? In my opinion, it's not just the color-coding, because Watson uses in their granules a hypomellose as well as another material called glycerol bayonet, and glycerol bayonet is hydrophobic, and both those can, along with the other ingredients in there. Can. As I testified. That's the point. Can. Doesn't say does. He says can. Yes, Your Honor. I believe the implication is that, in fact, it does release. And the fact that it can, can sitting on a shelf, maybe not, but in a formulation, I think is the point, is you use it in a formulation, it modifies the release. Your own witness said that sometimes it does and sometimes it doesn't, depending on the formulation. But he said that here it does. He offered an opinion of infringement. No, he didn't say does. He said can. Well, I disagree, Your Honor. He offered an opinion of infringement. He found that this constituted a modified release material. He didn't say a maybe. He said it does infringe. And, again, it's based on admissions by Watson itself. Their own ANDA says it does modify the release, so it's neither too fast nor too slow. Their own expert formulators said that we designed a controlled release score that has modified release materials. That's admissions of their formulators, one of whom was a 30B6 witness. Those are admissions. Again, their own patent application, which they admitted, describes their product, describes it as having a modified release score. That would be evidence that the district court accepted. But their own patent describes weights that are outside the range of your patent, right? It does describe weights down to 1%, yes. But their formulation has higher weights. By their own admission, at least two of the ingredients modify the release, the hydroxypropyl methyl cellulose, which is approximately 7%, the glycerol bayonet, which is smaller, around 2%. Again, that's well over 5%, which is the broadest of limitations. But it's the components acting together, the patent teaches, act to modify the release. And, in fact, the Watson inventors agree. The core itself, they say, is a modified release score. The ingredients act together to modify the release. Again, there's abundant evidence that supported this district court's decision that there was a modified release material. And it's unfair to point to isolated snippets of testimony that don't reveal the record as a whole. You pointed to the testimony to me, not me to you. Yeah, you were correct, Judge. I just disagree with the reading of the testimony. I think it's very clear that Dr. Williams was offering an opinion of infringement. He wasn't saying they made the infringement. He was saying they infringed. His opinion was this limitation was met. There was no equivocation there. He offered a testimony that was met. The district court accepted that and agreed that. And, again, there's abundant evidence. I would invite Your Honor to look to the product development report, beginning at AO13793, the record. And page after page after page, Watson described how small, minute variations in the amount of those ingredients in the formulation changed the dissolution profile. Change, it's modified. The release, it's indisputable based on the evidence of record. I know I'm running out of time. I wanted to briefly address validity to the extent that the court has any questions about that. I think what's important, maybe the most important point I'd like to make, is that there was unrebutted testimony that the formulation design here was unprecedented. What these inventors had come up with was a small slowing of the dissolution of the stomach to alleviate GI side effects. But they were able to balance that with the absorption of the active ingredients such that it got into the bloodstream at the same rate of an immediate release type formulation. And, therefore, it was the best of both worlds, the type of blood absorption of immediate release while alleviating side effects, as you would see, with something that slowed the release. And two of our expert witnesses, Dr. Williams and Dr. Sawcheck, testified in all their years of experience, they'd never seen this approach ever before. That testimony stood unrebutted. Watson had the opportunity to present a rebuttal testimony to that. They declined to do so. And so at least that piece of very powerful evidence supports the district court's determination that the patent claims at issue here were valid. And I'm curious. Your honors are running out of questions for me. Rather than belabor it, I think I'll recede my last 30 seconds. Thank you, Mr. Browning. Mr. Boggs has a little less than three minutes left to rebut. I'm sorry, your honor. I didn't hear you. You have a little less than three minutes, as it appears on your desk, for rebuttal. OK, does the ANDA have a dissolution profile in it which is outside the patent range? Our ANDA does not have a water dissolution profile in it at all. It doesn't contain that. It's not an important specification of a drug product. What's important are dissolution tests like SGF, the things that are going to simulate. So we have to look at the actual product? Yes. One thing I want to add to the modified release material discussion that you were having with counsel is that when we talk about things that we said about the modified release materials, or whether they were or they weren't, you have to understand that, again, what we were concerned about in our patent and in our ANDA was how things react in the body. These modified release materials that you see being claimed in this patent relate to the water dissolution outside the body. And one of the arguments you frequently hear with this whole patent is they behave differently, whether it's outside the body or inside the body. So what we have said relates to in the body, not the dissolution profile that you see in the patent. Now, one thing I want to go back to is the claims require measurement according to the USP-27 method. When you measure according to the USP-27 method, when you follow it, it's in the claims.  It requires the measurement of six samples. And in fact, that's what you see when you read the patent. You see measurement of six samples. The reason why you measure six samples is you're measuring one batch. You're measuring one large formulation, one pot of drug product. And any testing method has variation in it. So the USP, which is a scientific method, requires that you look at six of them and you try to get a uniform result. One test, one measurement, does not give you any sort of reliable result. And that's why they require six. Those are the additional points I wanted to make, unless you have any additional questions. Thank you, Mr. Boggs. Thank you. This is submitted. All rise.